# SUN CAB COMPANY, INCORPORATED
## *v.* CARMODY

[No. 285, September Term, 1969.]

*Decided March 23, 1970.*

The cause was argued before HAMMOND, C. J., and Mc-WILLIAMS, SINGLEY, SMITH and DIGGES, JJ.

*Leslie J. Polt,* with whom was *William W. Cahill, Jr.* on the brief, for appellant.

*W. Hamilton Whiteford* and *Stanley B. Rohd,* with whom were *Whiteford, Taylor, Preston, Trimble & Johnston* on the brief, for appellee.

McWILLIAMS, J., delivered the opinion of the Court.

After seven days of trial in the Superior Court of Baltimore City the court, Grady, J., having denied a motion for a directed verdict, submitted to the jury, with appropriate instructions, six issues, all of which were decided favorably to the appellee (Carmody). Following argument on motions for judgment N.O.V. and for a new trial, judgment on the verdict was made absolute in favor of Carmody against the appellant (Sun) in the amount of $55,777. Sun urges us to set at naught $17,200 (issues four and five) of the judgment, invoking, as it did below, section IV (5) of the Statute of Frauds, 29 Car. 2, C. 3, § IV (5) (1676), 2 *Alexander's British Statutes* 689 (Coe ed. 1912). Judge Grady held, correctly we think, that the Statute is not applicable. Our recital of the pertinent facts is a distillate of more than 1,000 pages of testimony.

Upon finishing law school Carmody, now 67, sought employment in the insurance industry. In time he became vice president, in charge of claims, of National Mutual Insurance Company of Washington. Eventually Herbert Glassman, who owned Sun, acquired control of National. Sun had been insured by National for many years, during which time there was an agreement between the two companies in respect of collections from tortfeasors causing damage to Sun's taxicabs in motor vehicle accidents. National was paid 50% of the amounts recovered out of which it had to pay its expenses, including attor-

neys' fees. In 1961 Glassman, having decided to sell his interest in National, offered Carmody the same arrangement. Carmody accepted. He began working on Sun's claims in December 1961. The arrangement was never reduced to writing. Carmody's status was that of independent contractor. He testified that under his arrangement with Sun he was not to be called upon to perform any other services without compensation. Glassman, on the other hand, testified that Carmody was to "assist Mr. Schiff [Sun's president and Glassman's brother-in-law] and pay his attorneys that represent him in all matters pertaining to insurance. Also, if * * * [he] had enough time" to handle "the safety end of the cab company."

In 1962 American Insurance Company, one of Sun's compensation carriers, demanded a retrospective premium of $23,000. Carmody testified Schiff proposed to him that he resist American's claim on the same contingent basis that applied in respect of the damage cases, i.e., 50% of any amount he could save for Sun. Schiff denied this. He said Carmody was obliged to do this free of charge. As a result of Carmody's activities American abandoned its entire claim.

A year or more after American made its demand Security Insurance Company, another compensation carrier, billed Sun for an $11,000 retrospective premium. Schiff again, according to Carmody, solicited his assistance on the same terms. Schiff denied this also. Again as a result of Carmody's efforts Security abandoned its claim.

On Christmas Eve, 1966, Schiff told Carmody the company had been sold and that all of Sun's personnel "was to go with the new owners with two exceptions, he [Schiff] was out and so was [Carmody]." When Carmody asked for an accounting and payment Schiff said "he wasn't going to pay [him] for anything." He said "he was getting out and he wasn't interested." He invited Carmody to "go ahead and sue Sun."

In denying Sun's motion for a directed verdict Judge Grady held, paraphrasing 2 Corbin, *Contracts* § 446

348

(1950), that "the agreement must be one of which it can truly be said that it is not to be performed within one year * * *, that there must not be the slightest possibility that it can be fully performed within one year." Judge Grady thereupon instructed the jury (as to issues four and five) :

"Now, Issue Four reads:

"Do you find any money due to the plaintiff from the defendant as a result of an alleged verbal agreement between the plaintiff and Mr. Schiff of the Sun Cab Company concerning the plaintiff's services rendered in connection with a claim made by the American Insurance Company against the defendant for retrospective insurance premiums?

"Issue Five is exactly the same except that instead of relating to the American Insurance Company it relates to the other insurance company mentioned in the evidence, the Security Insurance Company.

"In order for the plaintiff to recover under Issues Four and Five, you must find that he has established from the evidence that there was an agreement between the plaintiff and Mr. Schiff of the Sun Cab Company to the effect that the plaintiff would receive for his services in these two matters an amount equal to one-half of any savings to the Sun Cab Company, which he might accomplish. You must further find that these savings were in fact accomplished as a result of the plaintiff's services. So that if you find that this agreement was made and that the plaintiff did render services under this agreement concerning workmen's compensation insurance policies and that his services did effect savings for the defendant company, then your answer to part A of Issues Four and Five will be 'yes.' You will then go on and consider part B under each

of those two issues, and your answers then would be one-half of whatever savings you should find the plaintiff effected through his efforts. On the other hand, if you find that the plaintiff has failed to prove that such an agreement was made, or if your minds are in a state of even balance on that question, or if you find that he failed to prove that these services did effect the savings to the company, then your answer to part A of Issues Four and Five would be 'no.' If you answer 'no,' to both of these issues, then you would not consider part B which relates to the amount of money."

Counsel's exception to the instruction set forth above was based entirely on the ground that the cause of action stated in each of the two issues was barred by the Statute of Frauds.

## I.

Despite Sun's somewhat tortured arguments to the contrary we think our predecessors have given the applicable principles of law a solid foundation. In *Ellicott v. Peterson's Ex'rs,* 4 Md. 476, 488 (1853), Chief Judge Le Grand, for the Court, said:

"These principles have been recognized by innumerable decisions both in England and this country. And in pursuance of the principles which they sustain, especially that of the case of *Peter vs. Compton* [*Skinner,* 353], it has been held both in England and in these States, the statute will not apply where the contract can, *by any possibility,* be fulfilled or completed in the space of a year, *although the parties may have intended its operation should extend through a much longer period.*" (Original emphasis.)

In *Cole v. Singerly,* 60 Md. 348, 354 (1883), Judge Yellott, for the Court, said:

> "The learned Chief Judge [Le Grand] who delivered the opinion of the Court in that case [*Ellicott, supra*] supported this construction of the Statute by the citation of a number of authorities, both English and American.
>
> "This is therefore no longer a mooted question in Maryland. When there is a possibility that the services may be performed within a year, the remedy for a breach of the contract is not barred by the Statute. * * *."

The principles of law enunciated in *Ellicott* and *Cole* have been approved and followed in *Lipscomb v. Hess,* 255 Md. 109, 119 (1969) ; *Home News, Inc. v. Goodman,* 182 Md. 585, 595 (1944) ; *Warren v. Ayres,* 126 Md. 551, 557 (1915) ; *Campbell v. Burnett,* 120 Md. 214, 224 (1913) ; *H. J. McGrath Co. v. Marchant,* 117 Md. 472, 479-80 (1912) ; and *Lewis v. Tapman,* 90 Md. 294, 302 (1900).

We have found nothing in this record to indicate that the parties "expressly and specifically" agreed that their oral contracts were *not* to be performed by Carmody within a year. Indeed there is nothing to show what, if anything, either of them had in mind in this regard. Carmody said he "had no idea how long it would take * * * [him]." Sun, of course, denies there ever were any such agreements. Nevertheless, even if there were, performance within a year was impossible, argues Sun and, to be sure, its argument in this regard is quite persuasive of the *improbability* of performance within a year but, in our judgment, it falls conspicuously short of coming to grips with the concept of *impossibility*. It is at once apparent that Carmody is anything but a tyro in this branch of the insurance business. He emerges from this record as an experienced, competent, hard-nosed claims man who, when the need arose, did not hesitate to speak his mind. He related in colorful detail how he harassed American and that its entire claim ultimately was abandoned is hardly cause for surprise. We think it

rather obvious that the entire matter could have been wrapped up in much less than a year. After Carmody had pointed out irregularities in a few selected cases he considered he had American "very much on the run." Indeed, before long he was actually threatening to sue for the recovery of a sum greater than the $23,000 claimed. In these circumstances a compromise settlement might very well have been worked out or American might have done sooner what it did later, i.e., abandon its claim. Security's claim presented a similar situation and its disposition was accomplished in like manner. If not the most persuasive, surely the most diverting tidbit supporting the possibility of performance within a year is found in the cross-examination of Schiff:

> "Q. Let me ask you this, sir: In the past when you have handled this yourself, have you had any particular difficulty with any of them? [Claims for retrospective premiums.]
> "A. No."
>
> * * *
>
> "Q. My question is: On some of these, that you handled in the past, you closed out within twelve months?
> "THE WITNESS: I would say 'yes.' "

## II.

That Carmody has fully performed the contracts in respect of the claims of American and Security is beyond dispute. Indeed Sun, in effect, concedes what the jury has found to be so. If Carmody is denied compensation Glassman obviously will be enriched by $17,200. As Judge Le Grand said, for the Court, in *Ellicott, supra,* "[t]he law will not allow a man to accept a delivery of goods [or the performance of services] without making him liable to pay for them." *Id.* at 491. He went on to say:

> "Where there is a contract for the performance of services, or for the sale and delivery of goods which is within the statute, if the services be

> rendered or the goods delivered and be accepted, the party doing the work or delivering the goods may recover on a *quantum meruit,* and he may give in evidence the agreement under which the labor was performed or the goods delivered as a part of the *res gestae." Id.*

Quite recently, in *Lipscomb v. Hess, supra* at 119, Judge Singley, for the Court, said that "[w]e have consistently held that an agreement which has been fully performed by the party seeking to enforce it is not within the Statute of Frauds," citing *Home News, Inc. v. Goodman, supra,* and *Ellicott, supra.*

Were we to hold that these two contracts do fall within the Statute, Carmody would be entitled to have his case remanded for the assessment of damages by a jury on a *quantum meruit* basis. It is doubtful the result would be any different since the contracts would be admissible evidence and it seems to us unlikely that any jury, in measuring its verdict, would fail to adopt the percentage agreed upon. But there is no need to remand the case because we are fully persuaded, as was Judge Grady, that the Statute has no application here.

*Judgment affirmed.*
*Costs to be paid by appellant.*