CHESAPEAKE FINANCIAL CORPORATION ET AL. V.
DONALD S. LAIRD ET AL.

[No. 84, September Term, 1980.]

*Decided March 3, 1981.*

The cause was argued before MURPHY, C. J., and SMITH,
DIGGES, ELDRIDGE, COLE, DAVIDSON and RODOWSKY, JJ.

*Joseph F. Cunningham,* with whom was *Richard F. Cadigan* on the brief, for appellants.

*John H. Zink, III,* with whom were *Cook, Howard, Downes & Tracy* on the brief, for appellees.

RODOWSKY, J., delivered the opinion of the Court.

Appellees, plaintiffs below, obtained a general verdict and judgment thereon in an action for damages submitted to the jury on theories of deceit and negligent misrepresentation. It was claimed by the appellees that the corporate appellant's agent represented that it would enter into a real estate development joint venture with the appellees to which the corporate appellant would furnish the financing. Appellants' single contention here has two steps. They assert that (1) the undisputed evidence established that the alleged joint venture contract could not possibly be performed within one year, and that (2) an action for negligent misrepresentation will not lie based on representations relating to an oral contract which is within the Statute of Frauds. We shall affirm without reaching the second level of appellants' argument because the terms of the alleged contract do not bring it within the *infra annum* section of the statute.

A 33 acre parcel of land situate at Cinder and Pot Spring Roads, in Baltimore County, had been listed in November 1973 by the owner, Pot Spring Joint Venture, with appellant Chesapeake Financial Corporation (Chesapeake). Appellant Eugene C. Sutton (Sutton) was a vice president of Chesapeake and in charge of its real estate sales. Appellee Joseph P. Martin, Jr. (Martin), a real estate broker and developer, had in February 1974 expressed interest in the property to Sutton. In March 1974 appellee Donald S. Laird (Laird), an architect and builder, also spoke to Sutton about the site. Sutton suggested to Laird that he explore a possible joint venture in the property between himself and Martin. According to Laird, in his first conversation with Sutton concerning the property, its price and possible financing, Sutton said "money is no object" and Chesapeake "is financing this property."

Martin was involved in a townhouse development in Towson, Maryland, with a real estate developer and financier, Craig Lussi (Lussi). Martin asked Lussi to look at the Pot Spring property from the standpoint of possible development. In March 1974 Laird, Martin and Lussi decided that they wanted to acquire that property and build housing units on it for sale.[1] Lussi met with S. Herbert Tinley (Tinley), a vice president of Chesapeake, to discuss the possibility of Chesapeake either financing the property or participating in a joint venture. Lussi described the format of a possible agreement which was discussed at that meeting. Basically, if the property were developed, Chesapeake would be a 50% partner and the Martin-Laird-Lussi group would hold 50% among themselves. Chesapeake would supply all of the money necessary and the other group would do the work to make the property come to fruition. Chesapeake would receive interest on its money at 2 points above prime. At the end, the profit would be divided 50-50.

Martin testified that on March 15, 1974 he had telephoned Sutton about the availability of money and that Sutton informed him "there would be no problem in obtaining the money from Chesapeake Financial only on a joint venture basis where they would put up all of the monies and take fifty per cent of the profit, if any." On Sunday, March 24, 1974, while Lussi was in Europe on a vacation, Sutton came to Martin's office with a proposed contract for purchase of the Pot Spring property at $475,000. The urgency was that other purchasers were interested in the site. The contract presented to Martin contained no contingency as to financing. Martin testified that when he questioned Sutton about this, Sutton said that "Chesapeake Financial will guarantee all of the money when you go to settlement on the land, will provide all of the monies for the project itself." Martin signed the contract and Sutton left to obtain Laird's signature.

---

1. Lussi, however, was not interested in pursuing the project if there was any personal liability on his part.

Later that Sunday afternoon Sutton met Laird at Laird's home. Laird testified that he asked Sutton if Sutton was sure Chesapeake was financing the property and that Sutton said, "[Y]es indeed. No problem. Money is no problem."

The contract was accepted by the seller the next day, March 25, 1974.[2] It recited a deposit of $10,000 and provided for payment of the balance of $465,000 on or before 60 days from date. Chesapeake was recognized as broker to whom the seller agreed to pay a commission of 6%.

At a meeting of the investment management committee of Chesapeake on April 5, 1974 the committee declined to participate in the joint venture with "Martin et al." on the Pot Spring property. Apparently in an effort by Martin and Laird to buy time to arrange financing from another source, a written modification of the contract of sale was effected on May 22, 1974 under which an additional $10,000 deposit was paid, the purchase price was increased to $528,000 and the settlement at which the balance of $508,000 was to be paid was extended to 180 days from May 25, 1974. Also on May 22 the seller and Chesapeake agreed to a reduction of the broker's commission to $22,000. When Martin and Laird were unable to perform as purchasers under the revised contract, the seller brought suit. It was settled by Martin and Laird for $41,000, consisting of the $20,000 deposit and an additional cash payment of $21,000.

Martin and Laird then brought the instant suit against Chesapeake and Sutton claiming, *inter alia,* the funds paid in compromise of the seller's suit and legal fees incurred in defense of that action. The count in the declaration alleging fraudulent or negligent misrepresentation claimed that Sutton represented that Chesapeake "would be a joint

---

2. Appellees also presented evidence of representations by Sutton to the seller's side of the contract. One of the partners questioned Sutton whether the purchasers would have cash at closing to which Sutton replied that "his firm was involved in the deal, they were doing the financing and they were going to be equity participants in the project . . . ." The contract was also submitted for review by the attorney for the seller. Seller's counsel was concerned that his client might be passing up another offer. He testified that he asked Sutton where the financing was coming from and Sutton said that "Chesapeake was joint venturing the project with Laird and Martin, that they were providing all of the funds."

venturer and/or partner in the development of the subject property and . . . provide all necessary financing required by the venture at an interest rate of 2% over prime in return for a 50% partnership interest in the development . . . ." [3]

At trial Tinley was called as an adverse witness by the plaintiffs and admitted that Sutton would have been "in error" if he said on March 24, 1974 that Chesapeake was committed to finance purchase of the property. The jury, after having been instructed with respect to both fraudulent and negligent misrepresentation, returned a verdict in favor of Laird and Martin and assessed damages of $52,585. We granted certiorari prior to consideration by the Court of Special Appeals.

On this appeal Chesapeake and Sutton make no contention other than that they were entitled to judgment as a matter of law on the negligent misrepresentation theory. The linchpin of appellants' argument is that "the alleged joint venture contract" falls within what is now Md. Code (1957, 1978 Repl. Vol.), Art. 39C, § 1 ("No action may be brought . . . (3) [u]pon any agreement that is not to be performed within the space of one year from the making thereof; [u]nless the contract or agreement upon which the action is brought . . . is in writing and signed by the party to be charged . . . ."). We address this issue exclusively, without intimating any views on the factual or legal questions which surround the ground on which appellants choose to stand.

The "one year clause" of the Maryland Statute of Frauds was recently and fully reviewed for this Court by Judge Smith in *General Federal Construction, Inc. v. J.A. Federline, Inc.,* 283 Md. 691, 692, 393 A.2d 188, 189 (1978) where we said that the clause

> does not bar collection of damages for breach of an oral contract absent an express and specific provision in that contract that it was not to be performed

---

**3.** A count against Chesapeake only, which was based upon the existence of a partnership or joint venture agreement, was voluntarily dismissed by Laird and Martin.

within one year or a clear demonstration by its terms that it was not or could not be so performed.

Appellants do not assert any "express and specific provision" in the alleged joint venture contract, as represented, by which it was not to be performed within one year. Appellants do urge, however, that the contract could not be performed within a year, but they do not tarry on whether the contract so demonstrates "by its terms."

It appears that the joint venture project under discussion between the parties contemplated the acquisition of the 33 acre parcel, construction on it of approximately 66 dwelling units, their sale, and a division of the profits. Appellants focus on two items of testimony. Lussi, a witness called by the plaintiffs, stated on cross-examination that the "project was designed to be built in probably . . . twenty-four to thirty-six months, like any project that size." On cross-examination of Martin, the following testimony was elicited:

Q. Now, you said on direct that this would take I believe thirty-three months? A. Thirty months.

Q. Thirty months? A. Thirty months.

Q. If you speeded it up, could it have been done in twenty-four? A. Yes.

Q. Yes? Much less than that? A. Sixty-six units, no.

Q. It would take two years? A. Minimum would be two years.

Q. Two years? A. That is correct.

Q. There is no way you could have done it less than two years? A. I can't say that it's impossible. It's always possible it could be built in a year, but to sell sixty-six units in this high priced market in the Baltimore area in a year —

Q. What is your answer? A. No.

In applying the one year clause, "it makes no difference how long the parties expect the performance to take or how

reasonable and accurate those expectations are, if the agreed performance can possibly be completed within a year." *General Federal Construction, Inc. v. J.A. Federline, Inc., supra,* 283 Md. at 695, 393 A.2d at 190. "[T]he statute will not apply where the contract can, *by any possibility,* be fulfilled or completed in the space of a year, *although the parties may have intended its operation should extend through a much longer period." Ellicott v. Peterson,* 4 Md. 476, 488 (1853) (emphasis in text). The *Ellicott* statement of the rule has been reiterated in *Cole v. Singerly,* 60 Md. 348, 354 (1883), in *Campbell v. Burnett,* 120 Md. 214, 224, 87 A. 894, 898 (1913), and in *Sun Cab Co. v. Carmody,* 257 Md. 345, 349, 263 A.2d 1, 3 (1970).

*Federline* illustrates what is required for a clear demonstration, by its terms, that a contract could not be performed within one year. There a mechanical contractor sued a general contractor for breach of an alleged oral agreement to award the plaintiff the mechanical work on the construction of a hospital facility. The plaintiff's theory was that the oral contract incorporated the contract documents on which the plaintiff had based its low bid, which was used in the defendant's successful bid on the prime contract. The fact that 600 days was the estimated time for completion of the project did not bring the oral contract within the statute. *Accord,* 2 A. Corbin, *On Contracts* § 444, at 537 (1950). The documents required that, upon completion of the work, the subcontractor was to clean up construction dirt and to demonstrate the proper operation of plumbing controls. This did not cause the statute to operate because these provisions did not "by their terms specify that such work [would] be done more than a year after the date of the contract." 283 Md. at 699, 393 A.2d at 192. A one year warranty, calling for labor and materials to replace defective parts, and a four year warranty on a compressor did not "indicate that the contract [was] to be *performed* over a period of more than a year." *Id.* (emphasis in text.) But the plaintiff would also have been required under the contract documents to perform preventive maintenance on all equipment and controls for a period of one year *after* substantial completion of the

contract, and to furnish a complete water treatment service for one year *after* the owner's acceptance of the building. These latter provisions furnished the "clear demonstration by the terms of the contract that it could not be performed within the period of one year," and resulted in reversal of a judgment for the plaintiff. *Id.* at 700, 393 A.2d at 193.

So, where an oral contract called for the defendant to cut 200,000 feet of pine boards from timber on a designated tract, and sell the boards to the plaintiff, a specific performance action was not barred by the Statute of Frauds because there was "nothing in the contract set out in the bill to indicate that it was not to be performed and fully completed within a year from its date." *Neal v. Parker,* 98 Md. 254, 267, 57 A. 213 (1904).

*Warner v. Texas and Pacific Ry.,* 164 U.S. 418, 17 S. Ct. 147, 41 L. Ed. 495 (1896) is described in 3 S. Williston, *Law of Contracts* § 495, at 578 (3d ed. W. Jaeger, 1960) as the leading case on the *infra annum* section of the Statute of Frauds. The Court there said:

> The parties may well have expected that the contract would continue in force for more than one year; it may have been very improbable that it would not do so; and it did in fact continue in force for a much longer time. But they made no stipulation which in terms, or by reasonable inference, required that result. The question is not what the probable, or expected, or actual performance of the contract was; but whether the contract, according to the reasonable interpretation of its terms, required that it should not be performed within the year. [164 U.S. at 434, 17 S. Ct. at 153, 41 L. Ed. at 504.]

This Court has historically interpreted "literally and very narrowly" (2 A. Corbin, *On Contracts* § 444, at 535 (1950)) the words of the statute which apply only to "any agreement that is not to be performed within the space of one year from the making thereof . . . ." The appellants have not clearly

demonstrated that, under the terms of the alleged oral contract, as contrasted with the expectations of the parties, it could not be performed within one year.

> *Judgment of the Circuit Court for*
> *Baltimore County affirmed.*
> *Appellants to pay the costs.*