**Maxine PITMAN, et al., Plaintiffs,**

v.

**Eli ARAN, Defendant.**

**Civil No. AMD 94–2211.**

United States District Court, D. Maryland.

July 23, 1996.

Kathleen M. McDonald, Charles M. Kerr, Bruce T. Carton, Irwin, Kerr, Green, McDonald & Dexter, Baltimore, MD, for plaintiffs.

George E. Golomb, Baltimore, MD, for defendant.

## MEMORANDUM

DAVIS, District Judge.

## I. INTRODUCTION

This is a diversity of citizenship action in which Maryland law is controlling. The

plaintiffs' claims for equitable relief and damages arise out of a series of unsuccessful entrepreneurial efforts, and are grounded upon allegations of mismanagement, self-dealing and outright dishonesty.

The plaintiffs are Maxine Pitman ("Pitman") and Vendome Investment Group, Inc. ("Vendome"), a Maryland corporation, and the vehicle through which Pitman and defendant Eli Aran ("Aran") undertook to enter into various business ventures *inter se.* Pitman and Aran intended that she would provide start-up financing—and she did, in excess of $100,000, and he, the "know-how." The primary purpose of Vendome was to engage in construction projects in Israel, but Pitman and Aran first became involved in several other ventures. After these early ventures were abandoned, and after a first attempt to enter the Israeli construction industry fizzled, Aran established contact with a group of investors in New York and, without the active participation of Pitman, became heavily involved with those investors in projects to build residential housing and a mall in Or Akiva, Israel. Convinced that Aran had misplaced his loyalties, Pitman and Vendome filed a five-count complaint against Aran, alleging that Aran breached his pre-incorporation agreement with Pitman in respect to Vendome, usurped corporate opportunities belonging to Vendome, breached his contractual obligations to Pitman and Vendome under a promissory note and failed to return goods entrusted to him. Plaintiffs seek an accounting and disgorgement, damages, return of property and attorneys' fees and costs. In his counterclaim, Aran seeks enforcement of an alleged Israeli judicial judgment for attorneys' fees and costs entered against Pitman in litigation between the parties in that country.

Presently before the Court are Aran's motion for summary judgment on all of plaintiffs' claims and on his counterclaim, and plaintiffs' cross-motion for partial summary judgment as to the claims of breach of fiduciary duty and breach of the promissory note. No hearing is deemed necessary. *See* Local Rule 105.6 (D.Md.1995). For the reasons set forth below, I shall deny Aran's motion as to all claims. I shall grant plaintiffs' cross-motion with respect to the claim for breach of fiduciary duty, and I shall order an accounting by Aran so that damages on that claim might be determined. Finally, I shall also grant plaintiffs' cross-motion as to the breach of promissory note claim.

## II. SUMMARY JUDGMENT STANDARDS

Pursuant to Fed.R.Civ.P. 56(c), summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Matsushita Elec. Indust. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). A fact is material for purposes of summary judgment, if when applied to the substantive law, it affects the outcome of the litigation. *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510. "Summary judgment is not appropriate when there is an issue of fact for a jury to determine at trial, which is the case when there is sufficient evidence favoring the non-moving party upon which a jury can return a verdict for that party." *Shealy v. Winston,* 929 F.2d 1009, 1012 (4th Cir.1991). The burden is on the moving party to demonstrate the absence of any dispute of material fact. *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510. A party opposing a properly supported motion for summary judgment "cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another." *Beale v. Hardy,* 769 F.2d 213, 214 (4th Cir.1985); *see O'Connor v. Consolidated Coin Caterers Corp.,* 56 F.3d 542, 545 (4th Cir.1995), *rev'd on other grounds,* —— U.S. ——, 116 S.Ct. 1307, 134 L.Ed.2d 433 (1996). The non-movant "must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). *See also Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986); *Anderson,* 477 U.S. at 252, 106 S.Ct. at 2512; *Shealy,* 929 F.2d at 1012.

When both parties file motions for summary judgment, as here, the court applies the same standards of review. *ITCO Corp. v. Michelin Tire Corp., Com. Div.*, 722 F.2d 42, 45 n. 3 (4th Cir.1983), *cert. denied*, 469 U.S. 1215, 105 S.Ct. 1191, 84 L.Ed.2d 337 (1985) ("The court is not permitted to resolve genuine issues of material facts on a motion for summary judgment—even where ... both parties have filed cross motions for summary judgment.") (emphasis omitted); *Taft Broadcasting Co. v. United States*, 929 F.2d 240, 248 (6th Cir.1991). The role of the court is to "rule on each party's motion on an individual and separate basis, determining, in each case, whether a judgment may be entered in accordance with the Rule 56 standard." *Towne Management Corp. v. Hartford Acc. and Indem. Co.*, 627 F.Supp. 170, 172 (D.Md.1985) (quoting 10A Charles A. Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure: Civil 2d § 2720). Both motions may be denied. *See Shook v. United States*, 713 F.2d 662, 665 (11th Cir.1983).

## III. FACTS

The material facts summarized below were established in great detail by the plaintiffs in strict conformity to Rule 56 standards. Although Aran has made a feeble attempt to generate an issue of material fact sufficient to overcome plaintiffs' factual showing, he has failed in that attempt. Thus, I conclude that the below facts are "undisputed" for purposes of the cross-motions for summary judgment because Aran's effort to controvert them is legally insufficient.

### A. Pitman and Aran Meet and Form Vendome

In early 1990, Pitman, a 72–year–old retired school teacher, an erstwhile costume jewelry entrepreneur and a resident of Maryland, and Aran, a 40–year–old resident of New York with a background in construction management and later, jewelry sales, met through mutual friends and began to explore the possibility of collaborating on a venture to export diamonds from Guyana for sale in the United States. This venture, however, never came to fruition.[1]

In late 1990, Pitman and Aran became involved in other, less ambitious joint ventures, *e.g.*, an effort to sell costume jewelry and photo-mugs in shopping malls in New Jersey and Delaware. By the end of 1990, Pitman and Aran began negotiating with other entrepreneurs who were interested in constructing an industrial park in Israel. Incident to their efforts in that regard, Pitman and Aran agreed to form a corporate entity through which they might pursue such ventures. On January 17, 1991, Pitman and Aran entered into a "Pre–Organization Subscription Agreement" (the "Subscription Agreement"), which states as follows, in part:

> The undersigned, in consideration of their mutual promises, (monies lent Personally and to the Corporation shall be repaid to lendor [sic] in accordance with the terms of the promissory note and all ventures entered into by either Partner shall be done within the Corporation of VENDOME INVESTMENT GROUP, INC.), hereby severally subscribe to and agree to accept the following percentage of a proposed Corporation to be known as VENDOME INVESTMENT GROUP, INC. and which shall be [i]ncorporated in the state of Maryland.

Pls.' Mem.Supp.Mot.Part.Summ.J. at Ex. D. The Subscription Agreement provides that Pitman and Aran were each to own 50% of the shares of Vendome.

On January 25, 1991, the Articles of Incorporation of Vendome were filed in Maryland. They identified Pitman as president and treasurer, and Aran as vice president and secretary. Pitman's personal residence seems to have been Vendome's only business office. Shortly after its formation, Vendome's initial efforts to pursue the Israeli industrial park venture failed, seemingly as a result of disagreements among investors other than Pitman and Aran. On May 1, 1991, belatedly, Vendome had an informal organizational meeting. Numerous resolutions

---

1. This venture forms the basis of Pitman's claim of detinue. Pitman alleges that she gave Aran diamonds to sell and that Aran told her he had sold them for $850.00. Aran, however, contends that he returned the diamonds to Pitman and told Pitman that he was unable to sell them.

were adopted during this meeting, which apparently was attended only by Pitman, Aran and counsel. In particular, one resolution appointed Aran president and secretary, and Pitman vice president and treasurer. Vendome also adopted a resolution regarding the $100,000 loan Pitman was to make to Vendome, as contemplated in the Subscription Agreement. The resolution provides:

> That the Corporation execute a promissory note to Maxine Pittman [sic] for $100,000 at eight one-half percent (8½%) annual interest. The promissory note will be personally guaranteed by Eli Aran, the President of the Corporation, individually for one-half of the loss of the Corporation up to $50,000.00. A copy of the Note is attached to these Minutes.

*Id.* at Ex. I.[2] Pitman contends that she exhausted substantially all of the loan proceeds on Vendome-related expenses. Aran argues, however, that Pitman, as treasurer of Vendome, grossly mismanaged Vendome's finances.[3]

**B. Aran Becomes Involved with the New York Investors**

Between May and September 1991, Aran was introduced to a group of investors based in New York, who were also interested in pursuing real estate development and construction opportunities in Israel. The group incorporated in November 1991 under the name of Apollon Builders International, Inc. ("Apollon Builders").

On December 2, 1991, the board of directors of Apollon Builders held an organizational meeting, which Aran attended. The board adopted a series of resolutions which, *inter alia,* authorized Apollon Builders to enter into an employment contract with Aran. Also, the board voted to give Aran 5% of Apollon Builders' "gross profits (contract price less sum of hard and soft project cost)." *Id.* at Ex. N. As I have indicated above, Aran contends that he was free to enter into an employment contract with Apollon Builders because by December 1991, Vendome and/or Pitman had breached an alleged agreement to pay him "wages" of $1,500 weekly. Def.'s Mem. Opp'n Pls.' Mot.Part. Summ. J. at 3.

**C. Pitman and Vendome Seek Assurances**

In any event, it is undisputed that when Pitman became aware of the Apollon Builders board resolution from one of the investors, she drove to New York and confronted Aran. He denied any self-dealing, remonstrating with Pitman in a Chinese restaurant. Pitman Dep. at ¶ 2. To the contrary, Aran assured Pitman that everything he was doing with and through Apollon Builders was on behalf of Vendome. To demonstrate his good faith and proper intentions, on January 15, 1992, Aran agreed to the adoption by Vendome of a resolution, which states in pertinent part:

> WHEREAS, [Vendome] desires to enter into general partnerships or other joint

---

**2.** Aran asserts, without a scintilla of evidentiary support other than his own affidavit, that "in 1990 or 1991, Ms. Pitman and Vendome Investment Group, [I]nc. undertook to pay Mr. Aran $1500 per week for his services." Aran Aff. ¶ 2. Thus, as discussed more fully *infra,* Aran's factual defenses in this case rest in large measure upon his insistence that he was in truth an *employee* of Vendome, and that Vendome's cessation of "wage" payments to him necessitated and justified his acceptance of "employment" with competing entities. As a matter of law, as discussed in detail *infra,* Aran's attempt to avoid liability on this "employee" theory is unavailing.

**3.** Aran alleges the following, among other things: (1) Pitman used Vendome funds to pay her golf club dues; (2) Pitman used Vendome funds to pay her son's credit card bill; (3) Pitman made several imprudent investments; (4) Pitman con-

verted Vendome funds to another of her corporate alter egos, Maxine's Inc.; (5) Pitman's financial records are unreliable. *See* Def.'s Mem. Opp'n Pls.' Mot.Part.Summ.J. at 5–16. None of these allegations are sufficiently supported to preclude summary judgment on plaintiffs' claim under the promissory note guaranty. Aran has not asserted any affirmative claims against Pitman in respect to the performance of her responsibilities as an officer and director of Vendome.

In any event, as discussed *infra,* Pitman seeks summary judgment in the amount of $50,000 based on: (1) Aran's failure to honor his underlying fiduciary obligations to the corporate borrower, which proximately caused Vendome to default in its repayments to Pitman, and (2) Aran's consequent failure to pay one-half of the amount due under the note pursuant to the guaranty embodied in the corporate minutes. Summary judgment shall be granted on this claim.

ventures in order to evidence their [sic] joint investment in the construction of houses and other development in the State of Israel.

RESOLVED: That [Vendome] may enter into any and all partnership or joint venture agreements to build houses and other developments in the State of Israel.

RESOLVED: That [Aran] be and he is hereby authorized and directed for and on behalf of [Vendome] to execute, acknowledge, seal and deliver any and all such agreements for and on behalf of [Vendome].

RESOLVED: That the Board of Directors hereby authorizes, approves and ratifies any and all such Agreements executed by Eli Aran, the President of [Vendome]....

RESOLVED: That any and all such agreements executed by any officer and/or director of the Corporation be given over to the Corporation so that such agreements shall become a permanent part of the records and minutes of the Corporation.

Pls.' Mem.Supp.Mot.Part.Summ. J. at Ex. P ("Ratification Resolution").

Soon thereafter, disputes among the investors caused Apollon Builders to dissolve. Almost immediately, however, many of the same investors formed a new corporation, which was named Apollon Contractors International, Inc. ("Apollon US"). Aran retained the previously-awarded 5% interest, became a director, and was elected a vice-president of Apollon US. In order to conduct business in Israel, Apollon US formed an Israeli subsidiary, Apollon Contractors International, I.S., Ltd., ("Apollon Israel"). Apollon US owned 90% of the stock in Apollon Israel. Aran became principally responsible for the daily operations of Apollon Israel, which required that he travel frequently between his home in New York and Israel.

On or about February 21, 1992, Pitman learned that Vendome's 5% share in Apollon US stock would be issued in Aran's name, and not in Vendome's name. As a result, Pitman insisted that Aran execute an assignment agreement, which states:

FOR VALUE RECEIVED, Eli Aran ... hereby assigns and transfers all right, title and interest in any profits received from Apollon Contractors International, Inc., a New York Corporation, to Vendome Investment Group, Inc., a Maryland Corporation....

*Id.* at Ex. R (the "February Assignment"). Aran readily executed the February Assignment.

D. The Israeli Projects Begin

During the first half of 1992, Apollon Israel entered into a joint venture with Engel Contractors Ltd., ("Engel"), an Israeli construction company, to construct 750 units of residential housing in Or Akiva, Israel. From this joint venture, two Israeli companies were formed: (1) Builders Entity. No. 1 Ltd. ("Builders Entity"), in which Apollon Israel and Engel each held a 50% interest; and (2) Enpollen Ltd. ("Enpollen"), in which Apollon Israel and Engel each owned a 49.9% interest, and in which Building Entity owned a .2% interest. Aran was to oversee the Or Akiva construction project, and consequently, he and his family relocated to Israel in June 1992. The parties dispute whether Aran made a reasonable effort to stay in contact with Pitman after his relocation to Israel, but he admits that their contact with each other was infrequent. The record establishes that at this point, in mid–1992, Aran had effectively abandoned Pitman and Vendome.

E. Aran's Compensation, Benefits and Interests are Substantial

Plaintiffs allege, and Aran does not earnestly dispute, that Aran was generously compensated by Apollon US and Apollon Israel for his involvement in the Or Akiva construction projects. Notwithstanding his fiduciary duties as a director and officer of Vendome, Aran failed to disclose to Vendome the amount and nature of his compensation. For example, plaintiffs claim (and Aran has not disputed) that, from February 1992 to May 1992, Aran received $15,664.88 in payments from Apollon US. Also, from May 1992 through mid–1994, Apollon US deposited approximately $123,375 into the Israeli bank account of Major Service Co., A.G.,

("Major Service"), a Marshall Islands corporation, which Aran formed a mere two weeks after executing the February Assignment in favor of Vendome. Major Service was used as a conduit through which Apollon US deposited Aran's weekly compensation of $1,500.

In addition to direct compensation, Apollon US paid the $2,000 monthly rent for Aran's home in Israel. Aran contends, however, that the property was a company house used by many other Apollon employees. Other forms of compensation included an automobile provided by Enpollen for Aran's use, together with the payment of related expenses. Moreover, when Aran returned to the United States in July 1994, one of the companies under the Apollon US corporate umbrella provided Aran with a $45,000 "loan" to purchase a house in New York.

Plaintiffs further contend that, aside from monetary compensation, more likely than not, Aran received equity interests in various companies while he was a director and officer of Vendome. For example, as of December 28, 1992, two months after a company known as World Holding, Inc., ("World Holding"), incorporated in Delaware, Aran owned 50% of World Holding's outstanding shares. One of Aran's business associates testified on deposition that World Holding was formed to participate in the construction of a shopping mall near the Or Akiva project. Downes Dep. at 145. Aran admits that he did not disclose to Pitman or to Vendome any information concerning his interest in World Holding. Aran's Dep. at 217–220. Plaintiffs claim that Aran received $21,500 from World Holding between July 1994 and April 1995.

Finally, the plaintiffs allege Aran secretly owned 18% of GGF Development Corporation, 18% of Tessera Development Corporation, 18% of Chios Development, and 18% of Land Services, all companies about which plaintiffs have little knowledge and as to which an accounting would be necessary fully to explore. Although Aran has denied that he holds any interest in these entities, he has conceded that to the extent he holds an interest in any of these (or other) entities, he holds them on behalf of Vendome. Aran's Dep. at 344–45. Aran did not resign as an officer and director of Vendome until November 17, 1993, when he took umbrage at a remark made by Pitman about his mother.

On April 6, 1994, Apollon Israel sold all of its interest in Builders Entity and Enpollen to Suzzane N.H.Z. Holding & Property Management Ltd. ("Suzzane Holding") for $2.75 million. This transaction apparently disposed of all rights Apollon US and Apollon Israel had in the Or Akiva project. Aran did not inform plaintiffs that Apollon US's interest in the Or Akiva project was for sale or that it would be sold to Suzanne Holding, by whom Aran is now employed, either directly or as a consultant.

\* \* \*

On August 8, 1994, Pitman and Vendome instituted this action against Aran. Aran was deposed on December 5, 1995. In the course of his deposition, he admitted the truth of many subsidiary and ultimate facts that are highly probative of plaintiffs' claims. Shortly after Aran's deposition concluded, substitute counsel entered an appearance on his behalf. In an affidavit dated April 12, 1996, which was obviously composed by counsel (Aran refers to himself in the third person), Aran seeks to contradict and to ameliorate many of the admissions that were elicited from him during his deposition.

Plaintiffs have moved to strike Aran's affidavit in whole or in part. Although I shall deny the motion to strike, nevertheless, I shall not credit those portions of the affidavit which seek to contradict Aran's deposition testimony, *Barwick v. Celotex Corp.*, 736 F.2d 946, 959 (4th Cir.1984), or which demonstrate a lack of personal knowledge. Fed. Rule Civ.P. 56(e).

## IV. DISCUSSION

### A. Incorporation

■ Aran devoted a significant portion of his memorandum arguing that, based on his investigation, Vendome is not validly incorporated under Maryland law. As a consequence, he seems to argue, Vendome should be treated like a corporation that has forfeited its charter, rendering all corporate actions a nullity and voidable. To support this contention, Aran has produced a certificate (dat-

ed April 15, 1996) from the Maryland State Department of Assessments and Taxation ("SDAT"), which states that there is "no record of a foreign or domestic corporation by the name of Vendome Investment Group, Inc." Def.'s Reply Mem.Supp.Mot.Summ.J. Ex. A. This contention is made possible by the fact that at the organizational meeting of Vendome, the spelling of its name—Vendom—was altered to its present spelling—Vendome.

In any event, the plaintiffs vigorously oppose Aran's contention. They argue that Vendome was validly incorporated under Maryland law. They have filed a SDAT-certified copy (dated April 22, 1996) of Vendom[e]'s Articles of Incorporation, which were signed on January 25, 1991, and received by the SDAT on January 28, 1991. Pls.' Reply Mem.Supp.Mot.Part.Summ. J. Ex. 1. I agree with plaintiffs that Vendome has been at all times material to the events surrounding this action a viable legal entity in Maryland. The change in the spelling of Vendome's name is without legal effect.

Md.Code Ann., Corps. & Ass'ns § 2–102 provides in relevant part:

§ 2–102. Formation generally.

(a) *Signing, acknowledging and filing articles of incorporation.*—Except as provided elsewhere in this section, in order to form a corporation, one or more adult individuals acting as incorporators shall:

(1) Sign, acknowledge articles of incorporation; and

(2) File them for record with the Department.

(b) *Effect of acceptance of articles of incorporation for record; ....—*

(1) When the Department accepts articles of incorporation for record, the proposed corporation becomes a body corporate under the name and subject to the purposes, condition, and provisions stated in the articles.

(2) Except in a proceeding by the State for forfeiture of a corporation's charter, acceptance of the articles for record by the Department is conclusive evidence of the formation of the corporation.

*Id.*

As the plaintiffs have produced a certified statement from SDAT indicating that Vendome's Articles of Incorporation were approved and received on January 28, 1991, the creation of Vendome as a corporate entity is conclusively established. *See Cardellino v. Comptroller of Treas.*, 68 Md.App. 332, 339, 511 A.2d 573, 576, *cert. denied*, 307 Md. 596, 516 A.2d 567 (1986). Moreover, Vendome's corporate existence is evidenced by its engagement in business under its corporate name, the election of officers, the selection of directors, and the adoption of board resolutions and other contractual agreements. *See Richardson v. State*, 221 Md. 85, 89, 156 A.2d 436, 438 (1959) ("[T]he most satisfactory proof of corporate entity is the production of the articles of incorporation of a company, duly and properly authenticated, coupled with additional proof that the company is engaged in conducting business under its corporate name."). Thus, I conclude that Vendome is a viable corporation under the laws of Maryland.[4]

4. Even assuming that Vendome was not validly incorporated, Aran nevertheless would be estopped to use that argument as a defense here. Because Aran has represented himself, recurrently, as shareholder, president, vice president, secretary, and director of Vendome, he cannot now attempt to shield himself from potential liability by denying Vendome's corporate existence. In *Cranson v. I.B.M. Corp.*, 234 Md. 477, 200 A.2d 33 (1964), the Court of Appeals of Maryland observed:

The doctrine in relation to estoppel is based upon the ground that it would generally be inequitable to permit the corporate existence of an association to be denied by persons who have represented it to be a corporation, or held

it out as a corporation, or by any persons who have recognized it as a corporation by dealing with it as such; and by the overwhelming weight of authority, therefore, a person may be estopped to deny the legal incorporation of an association which is not even a corporation de facto.

*Cranson*, 200 A.2d at 39 (quoting 1 Clark and Marshall, Private Corporations, § 89). Here, Aran has not only represented himself as an officer and director of Vendome, but he has also admitted Vendome's corporate existence. Aran's Dep. at 487. Thus, Aran is estopped to deny the corporate existence of Vendome. *See Cardellino*, 511 A.2d at 577.

## B. Substantive Merits of Plaintiffs' Claims

Aran's factual defenses in this case (and the legal defenses which are based upon his version of the "facts") have been described in part above. He contends, syllogistically, that the Subscription Agreement, the Ratification Resolution and the February Assignment were concerned solely with "profits" from the entities and projects in which he became involved on an individual basis.[5] Thus, the argument goes, Aran is indebted to plaintiffs only to the extent that any such entity or project shows a "profit," by which he seems to mean any excess earnings and/or return on capital. Accordingly, since none of the entities or projects in which Aran was involved while he served as an officer and director of Vendome has generated "profits," and since all of the compensation and remuneration he has received has been in a form other than "profits," plaintiffs cannot make out any of their claims. This theory of defense, like the "employee" theory mentioned above, lacks evidentiary support in the record and is utterly without merit.

### 1. *Breach of Subscription Agreement*

 Aran contends that he is entitled to summary judgment as to any liability arising under the Subscription Agreement because Pitman cannot establish that he has breached the subscription Agreement. Aran argues narrowly that the Subscription Agreement was an "agreement between the parties to share profits," which, by its terms, is subject to the "condition precedent" that there *be* profits. Def.'s Mem.Supp.Mot.Summ.J. at 4. Aran argues that the apartment complex and the mall project were financial flops which have not yielded any profits and will probably not yield profits to which Vendome is entitled for many years. *See* Aran's Dep. at 628. Conceding that he might one day be indebted to the plaintiffs, Aran submits that he "is perfectly willing to give plaintiffs what

he is legally obligated to give them should he receive profits in the future"; since none of the ventures and projects have earned profits, however, he is not presently indebted to the plaintiffs. *Id.*

I am not persuaded by Aran's simplistic contention that his obligations under the Subscription Agreement would arise only when one of his independent endeavors begins to distribute "profits." The Subscription Agreement was executed well before Aran was introduced to the New York investors who eventually formed Apollon US. Hence, the argument is a *non sequitur.* Moreover, with the exception of Aran's deposition testimony regarding his obligations under the promissory note, Aran has not provided any evidence to substantiate his contention that Pitman and he agreed to a "condition precedent." Nor has Aran even attempted to show the source of this so-called "condition precedent." To the contrary, the plain words of the Subscription Agreement make clear that "all ventures entered into by either Partner shall be done within the Corporation of VENDOME INVESTMENT GROUP, INC." Although the agreement is subject to criticism as to its style and formality, nevertheless, neither its essential character nor the parties' intent is remotely ambiguous, and no "condition precedent" is reasonably to be implied to excuse Aran's self-dealing. *See generally Laurel Race Course, Inc. v. Regal Constr. Co.,* 274 Md. 142, 333 A.2d 319 (1975). Based on this record, Aran has not met his burden to establish that he is entitled to judgment as a matter of law as to any claim under the Subscription Agreement.[6]

### 2. *Breach of Fiduciary Duty*

 Both parties have filed motions for summary judgment as to this claim. Under Maryland law, it is well established that an officer/director of a corporation occupies a fiduciary relationship with the corporation

---

5. While the February Assignment did indeed transfer rights to "profits," the February Assignment must be read in conjunction with all of Aran's written undertakings.

6. Aran also argues that plaintiffs' claims should be dismissed because the plaintiffs are unable to

prove the amount of their damages. This contention is disingenuous. The plaintiffs' present inability to measure their damages with precision is exactly why they need a full accounting of all the benefits Aran has received from his involvement in the Israeli construction projects.

and owes the corporation a duty of utmost care and loyalty. *See Pittman v. American Metal,* 336 Md. 517, 522, 649 A.2d 356, 359 (1994); *Merchants Mortgage Co. v. Lubow,* 275 Md. 208, 215, 339 A.2d 664 (1975); *Waller v. Waller,* 187 Md. 185, 49 A.2d 449 (1946). A corollary to this rule is the "corporate opportunity" doctrine, which precludes corporate officers and directors from taking advantage of business opportunities which can reasonably be expected to fulfill a corporate purpose or interest. *See Independent Distr., Inc. v. Katz,* 99 Md.App. 441, 457, 637 A.2d 886, 893 (1994); *Faraclas v. City Vending Co.,* 232 Md. 457, 463, 194 A.2d 298, 301 (1963). When an officer or director breaches his duty of loyalty to the corporation by usurping a corporate opportunity for his personal benefit, the corporation may claim all of the benefits of the transaction for itself. "This holds true whether the officer or director spent his personal money or corporate money." *Billman v. State Deposit Corp.,* 86 Md.App. 1, 17, 585 A.2d 238, 246, *cert. denied,* 323 Md. 1, 590 A.2d 158, *and cert. denied,* 502 U.S. 909, 112 S.Ct. 304, 116 L.Ed.2d 247 (1991).

The plaintiffs contend that Aran breached his fiduciary duties to Vendome by usurping corporate opportunities, by failing to make full disclosure to Vendome regarding the ventures in which he was involved, and the monies, interest and benefits he received from those ventures, while he was an officer and director of Vendome.

■ In Aran's memorandum in support of his motion for summary judgment, Aran simply incorporated by reference his affidavit, which states:

> [D]uring the time I was an officer and director of Vendome Investment Group, Inc., I: (a) acted for Vendome's benefit in all matters I handled which were within the scope of Vendome's business; (b) avoided all conflicts between my duty to Vendome and my self-interest; (c) made full disclosure to Vendome and Maxine Pit-

man of all facts material to Vendome's decision to accept or reject, proposed or potential transactions and ventures.

> I did not usurp for myself business opportunities belonging to Vendome. Indeed, I transferred to Vendome all of my rights to the profit from the 5% share I owned in Apollon Contractors International, Inc. on February 21, 1992. Contrary to the allegations in the complaint, I engaged in no "stratagems and maneuvers" to hide acts from Ms. Pitman and Vendome. I obtained 5% of the shares of Apollon Contractor International, Inc., which I transferred to Vendome in 1992 even though Vendome paid no money for these shares and invested no capital in Apollon Contractors International, Inc. To my knowledge, no actual profit has been distributed by Apollon Contractors International, Inc. If and when profit is distributed to me by Apollon Contractors International, Inc., my share of the profit will be given to Vendome....

> At no time did I violate my fiduciary duties to Vendome.

Def.'s Mem.Supp.Mot.Summ.J. Ex. 3, Aran's Aff. at ¶ 2.

With nothing more than these bald assertions and conclusory statements, Aran has clearly failed to satisfy the requirements of Rule 56. It is transparently evident that he seeks, despite the adornments of a modicum of detail contained in his affidavit, simply to obtain summary judgment on the basis of flat denials. His denials, however, in the absence of a solid record of undisputed facts, would only necessitate a trial. Accordingly, Aran's motion for summary judgment shall be denied as to this claim.

■ Plaintiffs' cross-motion as to this claim, in contrast, rests on the detailed and well-supported documentary record consisting of more than 26 exhibits and, ultimately, Aran's own deposition testimony, which proved exceedingly helpful to plaintiffs.[7] They contend that Aran has breached his

---

7. On deposition, Aran's memory of acts, transactions and conversations with Pitman and others was extraordinarily selective. Still, in the face of the overwhelming documentary record amassed by plaintiffs, he admitted the essential accuracy of plaintiffs' historical account of his activities. As a matter of law, reasonable minds cannot disagree as to the effect of Aran's acts and omissions.

fiduciary duty to Vendome by usurping corporate opportunities to become active in the Israeli construction industry and by failing to disclose the extent of his personal, individual involvement in the Israeli construction projects and in other companies, while he was an officer and director of Vendome. As demonstrated by the above factual summary, plaintiffs have amply supported their allegations that Aran:

(1) accepted equity interests in World Holding and other entities without informing Vendome; (2) failed to advise Vendome that he was receiving payments and benefits from those entities; (3) failed to advise [Vendome] that he was involved in the Mall project; (4) failed to inform [Vendome] that he was receiving payments through Major Services Corporation; (5) failed to inform Vendome that Apollon US's interests in the Or Akiva project were for sale in March 1994; (6) failed to inform [Vendome] that he would forfeit his shares in World Holding if he did not come up with money to lend [World Holding] ...[;] (7) failed [to provide Pitman] with any of the documents generated in connection with any of [the construction projects or ventures].

*See* Pls' Mem.Supp.Part.Summ. J. at 28–29.

To rebut these substantial allegations, Aran again relies on his self-serving affidavit. Aran has made no genuine effort whatsoever to challenge the factual bases for these allegations or to create an issue of fact. He rests on the twin unsupported contentions that (1) he was free to seek employment where he wished, including employment with competing ventures, because Pitman and Vendome withheld his "wages;" and (2) he was responsible for turning over only "profits" to Vendome. These contentions are unavailing. The record firmly establishes that Aran has failed to rebut any of the allegations that form the core of plaintiffs' breach of fiduciary duty claim. To the contrary, Aran admitted on deposition the essential truth of these allegations. Accordingly, I shall grant plaintiffs' motion for summary judgment with respect to the breach of fiduciary duty claim.

### 3. *Specific Performance (Accounting)*

Each party has filed a motion for summary judgment with respect to this claim. The plaintiffs request a full accounting of the benefits and remuneration Aran has received in connection with his involvement in the Israeli construction projects. They argue that it is virtually impossible to determine the exact amount of damages caused by Aran's breach of fiduciary duty because Aran possesses all the relevant documentation.

Aran argues, however, that he has given the plaintiffs a full accounting of what his efforts on Vendome's behalf have earned. Ordering an accounting would be "pointless," Aran maintains, because there is no profit to award the plaintiffs. Moreover, Aran adds, "there is simply no point to the court ordering an accounting since Mr. Aran and the accounting firm have already been deposed."

Accounting, as a device of equity, is not frequently granted by courts in actions for damages. This case, however, fits within that limited class of cases in which it is appropriate. The Court of Special Appeals of Maryland observed that:

> The general rule is that a suit in equity for an accounting may be maintained when the remedies at law are inadequate. An accounting may be had where one party is under an obligation to pay money to another based upon facts and records which are known and kept exclusively by the party to whom the obligation is owed, or where there is a confidential or fiduciary relation between the parties, and a duty rests upon the defendant to render an account.

*P.V. Properties v. Rock Creek Village,* 77 Md.App. 77, 89, 549 A.2d 403, 409 (1988) (citations omitted).

Here, Aran clearly owes Vendome a fiduciary duty and a contractual duty pursuant to the Ratification Resolution, to disclose the details of any interest he enjoys (or previously enjoyed) attendant to his involvement in construction projects, which encompasses the primary purpose of Vendome's corporate existence. Accordingly, with respect to this claim, Aran's motion for summary shall be

denied; the plaintiffs' cross-motion shall be granted, and I shall order an accounting.

### 4. *Detinue*

When Pitman and Aran first met, they discussed exporting and selling diamonds from Guyana. Pitman gave Aran some diamonds/industrial minerals to sell on her behalf. Pitman claims that Aran has neither returned the diamonds to her nor conveyed to her the proceeds of sale. Aran, on the other hand, claims that he gave the diamonds back to Pitman because he could not sell them.

Aran concedes that there is a genuine dispute of material fact. However, Aran argues that this Court does not have subject matter jurisdiction to decide this claim because it fails to meet the jurisdictional amount to maintain diversity jurisdiction. This contention is frivolous.

> It is well established that where a plaintiff joins several claims against a defendant, and one of them satisfies the jurisdictional amount requirement, jurisdiction is present for all counts, including those for which the amount in controversy is patently less than [the statutory minimum]. Even if no single claim is for an amount in excess of [the statutory minimum], if the aggregate amount of the claims is in excess of [the statutory minimum], jurisdiction exists for each count.

*Griffin v. Red Run Lodge,* 610 F.2d 1198, 1204 (4th Cir.1979). Accordingly, summary judgment shall be denied as to this claim.

### 5. *Breach of Promissory Note*

Both parties have filed motions for summary judgment with respect to this claim, which involves the promissory note (and the related corporate minutes) Aran signed, personally guaranteeing 50% of the $100,000 loan Pitman made to Vendome. Plaintiffs cannot locate the actual note signed by Aran, although an unexecuted duplicate copy has been produced.

Seizing on the absence of a signed copy of the note, Aran contends, *inter alia,* that the breach of promissory note claim should be dismissed because it is barred by the Statute of Frauds. First, Aran argues that the real estate projects involved in the instant case could not have been reasonably expected to pay a profit within a year from the date of the agreement. *See* Md.Code Art. 39C, § 1(3). Second, Aran argues that the Statute of Frauds is a complete bar to Pitman's recovery because the plaintiffs have failed to produce a copy of the signed promissory note. Both of these arguments lack merit.[8]

Maryland courts have strictly applied the "one year" provision of the Statute of Frauds, whereby "[t]he statute will not apply where the contract can, by any possibility, be fulfilled or completed in the space of a year." *Chesapeake Financial Corp. v. Laird,* 289 Md. 594, 600, 425 A.2d 1348, 1351 (1981) (quoting *Ellicott v. Peterson,* 4 Md. 476, 488 (1853) (emphasis omitted)). *See also Griffith v. One Investment Plaza Associates,* 62 Md. App. 1, 5, 488 A.2d 182, 184 (1985) ("Statute of Frauds will bar a claim ... when it is impossible by the terms of the contract for it to be performed fully within one year"). Here, even assuming that the note was entered into with the specific condition that the construction projects must yield profits, it is still not impossible for that term to be satisfied within one year.

More important, despite the absence of the actual signed promissory note, the record in this case, as a matter of law, satisfies the Statute of Frauds. Aran's deposition testimony clearly states that he signed the promissory note in question:

Q: Do you ever recall attending a meeting at a Towson law firm, at any time?

A: Yes, I said yesterday, yes.

Q: It was actually two days ago, and I apologize for not remembering exactly what you said. Did you attend more than one meeting at that firm?

A: I don't remember.

---

**8.** The second contention would be more properly analyzed as an issue of definiteness of contractual terms.

Q: Do you have any recollection of the subject matter of any of the meetings, or meeting, however many there were?

A: I think one was creating of Vendome, or on the same one, or after, I don't remember, if it was one or two. And the other was the signing of the notes.

Q: The promissory note?

A: Correct.

Q: Related to the hundred thousand dollar loan?

A: Correct.

Q: Okay, So your best recollection is two meetings?

A: I don't remember.

Q: May have been one, may have been—

A: May have been more, I remember two subjects.

Q: Do you remember any other subjects being discussed at any of the meetings at the law firm?

A: No.

Aran's Dep. at 534–36. *See also id.* at 481–82. *Labrecque v. Sunbird Boat Co., Inc.,* 873 F.Supp. 946, 951 (D.Md.1994) ("a contract otherwise falling under the Statute of Frauds may nevertheless be enforceable when there is an admission by the opposing party that the contract was indeed formed"); *Mann v. White Marsh Prop. Inc.,* 321 Md. 111, 116, 581 A.2d 819, 821 (1990) ("A deposition [may] satisfy the Statute of Frauds if it contains an admission of the existence of the contract.").[9]

In a final attempt to establish a basis upon which this Court could enter summary judgment in his favor, Aran returns to his "profits" contention. For the reasons set forth above, that contention has been rejected as a defense to the other claims, and is rejected as well in relation to the claim on the note.[10]

Given the state of the record, I conclude that reasonable minds, properly instructed as to the objective law of contracts as applicable in Maryland, *see generally Orkin v. Jacobson,* 274 Md. 124, 128, 332 A.2d 901, 903 (1975), could not differ over the legal effect of Aran's undertakings contained in the Subscription Agreement, the Minutes of the Vendome organizational meeting and the promissory note evidencing the Pitman loan to Vendome. As a matter of law, Aran's liability under the promissory note guaranty is established, and Pitman has made a proper demand for payment. Accordingly, I shall enter summary judgment as to this claim in favor of Pitman.

**C. Defendant's Counterclaim: Enforcement of Israeli Judgment**

Aran has asserted a counterclaim to enforce an alleged Israeli court judgment against the plaintiffs, pursuant to the Maryland Uniform Foreign Money–Judgment Recognition Act, (the "Recognition Act"), Md.Code Ann., Cts. and Jud.Proc. § 10–701 *et seq.* Aran alleges the plaintiffs instituted an action in Israel against him which involved allegations similar to those in the instant action. The Israeli court ordered the plaintiffs to post a bond equal to $30,000 in order to pursue their claims, but the plaintiffs failed to do so. As a result, in October 1994, the Israeli court dismissed the action and entered an order requiring the plaintiffs to pay Aran's attorneys' fees and costs totaling $4,213.78. The plaintiffs simply deny these allegations.

The Recognition Act "was intended to promote principles of international comity by assuring foreign nations that their judgments would, under certain well-defined circumstances, be given recognition by courts" in Maryland. *Wolff v. Wolff,* 40 Md.App.

---

**9.** Additionally, the Statute of Frauds is satisfied by the resolution contained in the typed minutes of the May 1, 1991, Vendome organizational meeting, which is signed by Pitman and Aran. *See Della Ratta v. Broadneck Dev. Corp.,* 44 Md. App. 507, 511, 410 A.2d 32, 35 (1980). Thus, as a matter of law, the promissory note is an enforceable agreement.

**10.** The plaintiffs correctly argue that it defies common sense to suggest that Aran's guaranty,

intended to limit Pitman's personal financial losses, would only arise when the corporation began receiving profits. They also argue that, since Aran signed the promissory note in May 1991 and Aran testified that he was not aware of the construction project with Apollon U.S. until February 1992, "profit" from that specific construction project could not have not been a "condition precedent" to Aran's obligation under the promissory note.

168, 175, 389 A.2d 413, 417 (1978), *aff'd*, 285 Md. 185, 401 A.2d 479 (1979). The Recognition Act defines a foreign judgment as follows:

> any judgment of a foreign state granting or denying recovery of a sum of money. It does not mean a judgment for taxes, fine, or penalty, or a judgment for support in matrimonial or family matters.

Md.Code Ann.Cts. and Jud.Proc. § 10–701(b).

The Recognition Act applies to a foreign judgment that is final, conclusive, and enforceable where rendered even though an appeal is pending or it is subject to appeal. *Id.* § 10–702. By its terms, the Recognition Act is applicable "only to certain types of foreign money judgments, and does not apply to others." *Wolff*, 389 A.2d at 416. In the instant case, the plaintiffs have not proffered any reason why Aran's Israeli judgment should not be recognized by this Court. And in that regard, the Court will consider plaintiffs' silence as an admission that the Israeli judgment is final, conclusive, and entitled to recognition.

The inquiry does not end here, however. Courts have indicated that recognition and enforcement are two separate inquiries. *See id.* at n. 3. *See also Guinness PLC v. Ward*, 955 F.2d 875, 889 (4th Cir.1992) ("[W]hile the Uniform Recognition Act provides a basis in law for enforcing foreign money judgments which are entitled to recognition thereunder, nowhere does the Act dictate that where such a judgment is entitled to recognition it must automatically and unconditionally be enforced.")

For guidance, the Court turns to the Maryland Uniform Enforcement of Foreign Judgments Act (the "Enforcement Act"), Md. Code Ann., Cts. and Jud.Proc. § 11–801 *et seq.*, which applies to any judgment of a domestic or foreign court that is entitled to full faith and credit in Maryland. *Id.* at § 11–801. The Enforcement Act provides that "a copy of any foreign judgment authenticated in accordance with an act of Congress or statute of this State" may be enforced. *Id.* at § 11–802.

In the instant case, Aran has not produced a copy of the judgment. To establish the existence of the Israeli judgment, Aran has submitted: (1) a copy of the relevant portions of the Israeli court's record (translated into English by Aran's Israeli lawyer), and (2) Aran's affidavit. Aran argues that the Enforcement Act's request for a copy of the foreign judgment is permissive rather than mandatory. Aran adds that "[i]n view of the relatively small amount involved, [and] the expense of hiring an Israeli attorney to get the judgment," an affidavit and the translation of the court record should be sufficient under the summary judgment standard. I am wholly unpersuaded by Aran's proffered justifications, and shall deny summary judgment as to this claim, which, very likely, will be set-off by Pitman even if it is established at trial.

## V. CONCLUSION

For the reasons set forth herein, Aran's motion for summary judgment shall be denied in its entirety; plaintiffs' cross-motion for partial summary judgment shall be granted. A separate order shall be issued herewith.