Vera YANCEY, Plaintiff,

v.

NATIONAL CENTER ON INSTITUTIONS AND ALTERNATIVES, Defendant.

Civ. No. AMD 96–3557.

United States District Court, D. Maryland.

Dec. 5, 1997.

eral months he was confined at FCI–Cumberland.

Donna M. Larkin, Bendos, Drechsler, Larkin & Walters, P.C., Baltimore, MD, for Plaintiff.

David S. Greber, Stephen S. Burgoon, Greber & Simms, Frederick, MD, for Defendant.

MEMORANDUM

DAVIS, District Judge.

Plaintiff Vera Yancey ("Yancey"), a former employee of the National Center on Institutions and Alternatives ("NCIA") filed this action against NCIA alleging discrimination based on sex and religion under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*, as well as violations of the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 *et seq.*, and the Fair Labor Standards Act of 1938, 29 U.S.C. § 201 *et seq.*[1] This Court has jurisdiction pursuant to 28 U.S.C. § 1331.

Pending before this Court is NCIA's motion for summary judgment on Yancey's Title VII claims.[2] The parties' submissions have been carefully considered, and no hearing is deemed necessary. Local Rule 105.6 (D.Md. 1997). For the reasons stated below, I shall grant NCIA's motion for summary judgment.

## I. FACT[3]

NCIA is a non-profit, state-funded organization which provides residential care for troubled youth and developmentally disabled adults. Yancey was employed as a residential counselor at NCIA from April 15, 1992, until her discharge on October 20, 1995. Originally, she was assigned to work in the Youth in Transition ("YIT") program. After several months, she was transferred to work with developmentally disabled adult clients of the Maryland Developmental Disability Administration, which she continued to do until her termination.

While working with adults, Yancey was required to supervise each developmentally disabled client within the alternative living unit ("ALU") to which she was assigned. Among her duties were administering medications, counseling clients, feeding clients, and transporting clients for various appointments.

Yancey was involved in a work-related car accident in February 2, 1994. Shortly after returning to work, she was placed at a Rosewood Campus ALU. Three days after beginning work at Rosewood, Yancey was injured in the course of her duties as she attempted to restrain a client. As a result of this injury, she missed six months of work during 1994.

Yancey returned to work as a residential counselor in December 1994 and was assigned to the Colmar Drive ALU. From early 1995 until the summer of 1995, Darren Johnson ("Johnson") served as the acting lead counselor at the Colmar Drive ALU. In the summer of 1995, both Yancey and Johnson applied for the position of permanent lead counselor. Upon submitting her application, Yancey was told by Ethel McCullough ("McCullough"), NCIA Director of Program Services, that she would never get a position of authority at NCIA because she was not Muslim. Johnson, a non-muslim, was made permanent lead counselor on approximately August 11, 1995.

NCIA has a relatively strict policy regarding use of sick leave. This policy is designed to lessen the risks attendant to leaving developmentally disabled adults without adequate supervision. The policy statement, which Yancey conceded she had an opportunity to review, provides in part:

Abuse of Sick Time:

The purpose of sick days is to provide compensation to employees who must miss work as a result of illness; they are not to increase the number of annual leave days. Abuse of sick leave can result in disciplinary action up to and including termination.

---

1. Yancey acting *pro se*, filed a form employment discrimination complaint. In the narrative which Yancey submitted with the complaint, she stated her claim under the Fair Labor Standards Act.

2. After retaining counsel, Yancey withdrew her claim under the Americans with Disabilities Act in her memorandum in opposition to NCIA's motion for summary judgment, filed on July 14, 1997, and Yancey voluntarily dismissed with prejudice her claim under the Fair Labor Standards Act on November 18, 1997.

3. I will present Yancey's version of the facts wherever the parties' evidence conflicts, at least to the degree that her allegations have support in affidavits, depositions or other documentary evidence. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

The following new policies are intended to control abuse of sick time:

1) Use of two consecutive sick days or three days in any two week period will require a written medical statement for return to work and payment of those days.

2) Two instances of sick time use during any three month period, three instances during any six month period, and/or five instances in a 12 month period will be monitored to determine whether personnel action is warranted.

Between mid-July 1995 and mid-October 1995, Yancey missed 52 hours of work time. Yancey's absences were unrelated to her two work-related injuries.

On October 7, 1995, Thomas Pointer ("Pointer"), NCIA Residential Coordinator, saw Yancey at a music concert. The following day, Yancey called Johnson indicating that she was sick and could not come to work that day. Shortly after Yancey called Johnson, Johnson learned from Pointer that Yancey had been at the concert until late the night before. Johnson indicated to Yancey that her calling in sick "pissed him off." Yancey alleges that Johnson "wrote her up" on October 9, 1995, for abuse of sick time. When Yancey refused to sign the written warning, a meeting was scheduled for October 11, 1995.

On October 11, 1995, a meeting was held for the purpose of issuing the warning notice to Yancey and discussing her sick time. Present at the meeting were McCullough, Pointer and Yancey. At the meeting, Yancey requested that she be provided with the dates of the absences at issue so that she could obtain doctor's notes for those dates; she stated that Johnson wrote her up with the purpose of "getting back at [her] for refusing his sexual advances."[4] She alleges that Pointer told her that she was not being sexually harassed and that she was making excuses for her abuse of sick leave and "getting caught" at the concert. Yancey alleges that Pointer then tore up the written warning issued by Johnson, stating that he was doing so because she had alleged sexual harassment against Johnson. After Pointer's comment, and after she was not provided with the dates of her absences, Yancey became angry, raised her voice and behaved unprofessionally. Thereupon, Pointer issued a written five-day suspension without pay for "insubordination."

Yancey appealed her October 11, 1995, suspension, and a meeting was held on October

---

4. Yancey's claim that Johnson "wrote her up" for abusing sick leave to get back at her for rejecting his sexual advances could arguably support a claim of *quid pro quo* sexual harassment. However, NCIA asserted in its motion for summary judgment that Yancey's deposition testimony confirmed that she is not bringing a claim of *quid pro quo* sexual harassment. Yancey did not respond to this assertion in her memoranda. Accordingly, I accept NCIA's assertion as true and find that Yancey has made no claim of *quid pro quo* sexual harassment.

In any event, Yancey's deposition testimony shows that she lacked any indication that rejection or acceptance of Johnson's sexual advances would have any affect on the tangible conditions of her employment, and therefore no *quid pro quo* claim lies. The deposition transcript reveals the following:

Q. You didn't state in your charge of discrimination that Darron [sic] Johnson said you'd get a raise if you had sex with him, right?
A. No.
Q. Or a promotion, right?
A. No.
Q. Or a better schedule.
A. No.
Q. Or a bonus.
A. No.
Q. You didn't state in your charge of discrimination that Darron [sic] Johnson told you that you would lose your job if you refused to have sex with him, right?
A. Right.
He never told you you'd get a worse work schedule.
A. Right.
Q. He didn't tell you you'd lose pay or employee benefits if you didn't have sex with him.
A. No.
Q. He never told you you'd lose a promotion if you didn't have sex with him, right?
A. No.
Q. So you never allege that Darron [sic] Johnson said he would make your conditions of employment better or worse depending on whether you had sex with him, right?
A. Right.
Any effort on Yancey's part to salvage a *quid pro quo* claim by submitting an affidavit contradicting her deposition testimony would be inappropriate for consideration by this Court. *Pitman v. Aran*, 935 F.Supp. 637, 643 (D.Md.1996)(citing *Barwick v. Celotex Corp.*, 736 F.2d 946, 959 (4th Cir.1984)).

17, 1995, to address the appeal. Present at the meeting were NCIA Personnel Director Melanie Hoelter ("Hoelter"), McCullough and Yancey. At the meeting, Yancey presented a letter which she had written detailing the reasons for her appeal and reporting some of her allegations of sexual harassment against Johnson. Yancey's letter stated, in relevant part:

> I called in sick on 10/8/95 because that morning I woke up with severe cramps. My Lead Counselor, Darren Johnson, told me that this "pissed him off" and so he wrote me up for calling in sick.
>
> \* \* \* \* \* \*
>
> It should also be noted that my lead counselor, Darren Johnson, said to me that when I dispute and argue with him it "gives him an instant hard-on." This is sexual harassment. He was alluding to the fact that he liked me and I instantly told him that I don't mix busines [sic] with personal life & was not interested in him (and also that I don't appreciate that kind of language). It is degrading. Ever since this, Mr. Johnson has made work difficult for me.
>
> \* \* \* \* \* \*
>
> I am asking you to seriously reconsider & re-evaluate the warning and the suspension as they are charges which cannot be substantiated, and are the result of Mr. Johnson's sexual advances on me being turned down.
>
> \* \* \* \* \* \*
>
> I also expect the sexual harassment to be investigated.
>
> \* \* \* \* \* \*
>
> I have consulted with my attorney ... regarding these matters.

Hoelter, the person to whom NCIA's Employee Manual indicates complaints of sexual harassment should be made, responded to Yancey's allegations of sexual harassment by indicating that NCIA would conduct an investigation. Hoelter asked if Yancey felt comfortable returning to her work environment. When Yancey said that she did not, Hoelter informed her that she should not report to work the next day. Yancey and Hoelter agreed to meet again on Thursday, October 19, 1995, regarding the alleged sexual harassment.

After the meeting on October 17, 1995, Johnson was informed of Yancey's allegations, and requested a meeting where he could hear Yancey's allegations directly from her. On October 20, 1995, a meeting was held regarding Yancey's allegations, which Yancey voluntarily attended.[5] Present at the meeting were Hoelter, McCullough, Pointer, Johnson and Yancey. In addition to the allegations previously lodged against Johnson, Yancey indicated that Johnson had told her that she reminded him of his baby's mother. Johnson admitted that he stated that Yancey "pissed him off" but denied Yancey's allegations of sexual harassment. After Yancey's allegations were addressed, Johnson was excused from the meeting.

As the meeting continued, Yancey requested a transfer from Johnson's supervision. She was offered a transfer to the only full-time position vacancy at the Rosewood ALU, where she had been attacked by a resident in 1994 and would be under the supervision of Pointer. Yancey refused the transfer, stating that she did not want to work under the supervision of Pointer because he had disciplined her regarding absences and she had been hurt at the Rosewood ALU. Yancey requested a transfer to the YIT program, where she had worked when she first started at NCIA. Yancey's request was denied. Yancey was told to report for work on Saturday, October 21, 1995. Yancey indicated that she did not intend to report for work. Consequently, Yancey was discharged and informed that if she wished to appeal the discharge she must do so no later than Monday, October 23, 1995.[6] Yancey did not appeal the discharge.

---

5. The meeting was rescheduled from October 19 to October 20, 1995, at Yancey's request.

6. It is unclear whether Yancey was discharged and informed of her appeal rights at the October 20, 1995, meeting or sometime thereafter.

By letter dated October 24, 1995, Hoelter informed Yancey in writing of the basis for her discharge. The letter stated, in part:

> Your involuntary termination from N.C.I.A. is based upon your refusal to accept a work assignment. After numerous requests, you adamantly refused this work assignment without just cause. Your unwillingness to report for work and negative attitude despite company efforts [sic] honor your requests for a transfer contributed to our decision.

On October 27, 1995, addressing Yancey's allegations of sexual harassment, Hoelter issued a written warning to Johnson which stated, in part:

> As I expressed to you, N.C.I.A.'s Company Policies on Sexual Harassment are quite thorough, and do not tolerate harassment in any form. You are reminded to be professional at all times when engaging in conversations with staff and or consumers. Any and all conversations in the work place are subject to company policy. You must refrain from obscene, vulgar, sexist or racial language that would be offensive to any staff or consumer.

In late October 1995, Yancey submitted an employment application to a receptionist at NCIA. Yancey was not rehired.[7]

In her answers to interrogatories, Yancey raised for the first time additional allegations of sexual harassment by Johnson which it is undisputed were previously unknown to NCIA. She alleged that during the time when Johnson supervised her, from the time he became acting lead counselor in early 1995 until her termination on October 20, 1995, he commented "I bet you're real hairy," "what do you do with those lips," and, upon seeing Yancey in tight-fitting clothing, stated "I never knew you were packed like that." Yancey further alleged that Johnson came to work on weekends when she was alone with clients and he was not scheduled for duty,

and that Johnson told her that he liked her, asked her to sit on his lap, asked her to go to a hotel with him and regularly made "sexual comments about [her] looks and parts of [her] body as well as unsolicited and unwelcome advances." Yancey elaborated on her prior allegations stating that Johnson "frequently" told her that she reminded him of his baby's mother, and was "noticeably enlarged in his private area" when making the previously reported "hard-on" comment.

## II. SUMMARY JUDGMENT STANDARDS

Pursuant to Fed.R.Civ.P. 56(c), summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986). In considering a motion for summary judgment, the facts, as well as the inferences to be drawn therefrom, must be viewed in the light most favorable to the nonmovant. *Matsushita Elec. Indust. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88, 106 S.Ct. 1348, 1356–57, 475 L.Ed.2d 574 (1986). A party moving for summary judgment is entitled to a grant of summary judgment only if no issues of material fact remain for the trier of fact to determine at trial. *Id.* at 587, 106 S.Ct. at 1356. A fact is material for purposes of summary judgment, if when applied to the substantive law, it affects the outcome of the litigation. *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510. "Summary judgment is not appropriate when there is an issue of fact for a jury to determine at trial, which is the case when there is sufficient evidence favoring the non-moving party upon which a jury can return a verdict for that

---

7. In her complaint, Yancey claimed that NCIA discriminatorily failed to rehire her on October 22, 1995, a Sunday. However, Yancey's deposition testimony reflects that she does not know why she was not rehired:

Q. What is the reason why you believe you weren't rehired?

A. I don't know. I guess they just didn't want to rehire me, didn't want to deal with it.

Since Yancey does not provide a factual basis for her claim that NCIA failed to rehire her for a discriminatory reason, I find, as a matter of law, that Yancey has not established a prima facie case of discriminatory failure to rehire.

party." *Shealy v. Winston,* 929 F.2d 1009, 1012 (4th Cir.1991).

A party opposing a properly supported motion for summary judgment bears the burden of establishing the existence of a genuine issue of material fact. *Anderson,* 477 U.S. at 248–49, 106 S.Ct. at 2510–11. The nonmovant "cannot create a genuine issue of fact through mere speculation or the building of one inference upon another." *Beale v. Hardy,* 769 F.2d 213, 214 (4th Cir.1985). *See O'Connor v. Consolidated Coin Caterers Corp.,* 56 F.3d 542, 545 (4th Cir.1995), *rev'd on other grounds,* 517 U.S. 308, 116 S.Ct. 1307, 134 L.Ed.2d 433 (1996). "When a motion for summary judgment is made and supported as provided in [Rule 56], an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in [Rule 56] must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). *See Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986); *Anderson,* 477 U.S. at 252, 106 S.Ct. at 2512; *Shealy,* 929 F.2d at 1012.

### III. SEXUAL HARASSMENT

Title VII prohibits "an employer" from "discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's ... sex." 42 U.S.C. § 2000e–2(a)(1). In 1986, the Supreme Court recognized Title VII's expansive scope when it held that the prohibition against "discrimination" protects employees from hostile environment sex discrimination. *Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 73, 106 S.Ct. 2399, 2408–09, 91 L.Ed.2d 49 (1986). Noting that "the language of Title VII is not limited to 'economic' or 'tangible' discrimination" but "evinces a congressional intent to strike at the entire spectrum of disparate treatment of men and women in employment," *id.* at 64, 106 S.Ct. at 2404 (internal quotations omitted), the *Meritor* Court endorsed the substantial body of lower federal court case law which had established that a claim of hostile environment sex discrimination is actionable under Title VII. *Id.* at 65–67, 106 S.Ct. at 2404–06.

To sustain a claim of sexual harassment under Title VII, plaintiff must allege and prove that (1) the subject conduct was unwelcome; (2) it was based on her sex; (3) it was sufficiently severe or pervasive to alter plaintiff's conditions of employment and to create an abusive or hostile work environment; and (4) it was imputable on some factual basis to the employer. *Spicer v. Commonwealth of Va.,* 66 F.3d 705, 710 (4th Cir.1995) (en banc).

Yancey has not established a prima facie case of hostile environment sex harassment because she has not shown a basis to impute liability to NCIA. An employer may be held liable for illegal sexual harassment under Title VII where the employer engages or acquiesces in illegal sexual harassment, or " 'where a proprietor, partner or corporate officer participates personally in the harassing behavior.' " *Andrade v. Mayfair Management Inc.,* 88 F.3d 258, 261 (4th Cir.1996) (citing *Garber v. Saxon Business Prod., Inc.,* 552 F.2d 1032 (4th Cir.1977) (per curiam), and quoting *Katz v. Dole,* 709 F.2d 251, 255 (4th Cir.1983)). In *Meritor,* the Supreme Court addressed the issue of imputing liability to an employer for actions of a supervisor and instructed lower courts to adapt agency principles to determine an employer's liability under Title VII. 477 U.S. at 72, 106 S.Ct. at 2408. Consistent with *Meritor,* the Fourth Circuit established that:

> an employer is liable for a sexually hostile work environment created by a supervisor or other employee only if the employer knew or should have known of the illegal conduct and failed to take prompt and adequate remedial action.

*Andrade,* 88 F.3d at 261 (collecting cases). "Where an employer implements timely and adequate corrective measures after harassing conduct has come to its attention, vicarious liability should be barred regardless of the specific motivation for the wrongdoing or the particular cause of action." *Dennis v. County of Fairfax,* 55 F.3d 151, 156 (4th Cir.1995).

I am cognizant that the adequacy of an employer's remedy ordinarily "is a question of fact which a court may not dispose of at the summary judgment stage if reasonable

minds could differ as to whether the remedial action was 'reasonably calculated to end the harassment.' " *Paroline v. Unisys Corp.*, 879 F.2d 100, 106 (4th Cir.1989), *vacated in part on other grounds*, 900 F.2d 27 (4th Cir.1990) (en banc) (quoting *Katz*, 709 F.2d at 255). However, I find that reasonable minds could not differ as to whether NCIA's actions were prompt, adequate and reasonably calculated to end the harassment, and summary judgment in NCIA's favor is warranted.

Yancey first reported Johnson's alleged activity to other NCIA employees on October 11, 1995, in response to NCIA's attempt to issue a written warning to her regarding abuse of sick leave. Upon receipt of the specific allegations of sexual harassment on October. 17, 1995, Hoelter, the person to whom NCIA's policy indicates sexual harassment of the type alleged is to be reported, immediately indicated that an investigation would be conducted.[8] Johnson was promptly confronted with the allegations against him

and a meeting was held to address Yancey's allegations against Johnson on October 20, 1995, which Yancey voluntarily attended. Ultimately, despite Johnson's denials of harassment, within 16 days of her first report of harassment to anyone at NCIA, a written warning was issued to Johnson regarding his conduct.

 NCIA's actions were reasonably calculated to end the harassment alleged. From the time of her original complaint on October 11, 1995, Yancey was never placed in a position where she was required to spend a minute alone with Johnson or to work with him at all. After her October 17, 1995, letter to Hoelter detailing some of her allegations, Yancey was specifically authorized to remain off work if she felt uncomfortable around Johnson. On October 20, 1995, Yancey requested a transfer from Johnson's supervision. NCIA immediately offered Yancey the only full-time vacancy available,[9] which Yancey refused.[10] Short of creating a new posi-

---

8. Although not the basis of my conclusion, any prompt investigation into the "hard-on" comment was precluded by Yancey's failure to report it to anyone at NCIA for at least six weeks after it allegedly occurred. Furthermore, Yancey concedes that there were no witnesses to Johnson's alleged conduct.

9. NCIA asserts and Yancey acknowledges that she was told on October 20, 1995, that the Rosewood ALU position was the only full-time vacancy available at the time. Yancey has failed to produce any affidavits, deposition testimony or other appropriate evidence that NCIA's assertion in this regard was false.

10. Yancey argues in her response to NCIA's motion for summary judgment that NCIA's " 'corrective measures' ... amount to no more than a constructive discharge." Although Yancey's first mention of constructive discharge is in her responsive memorandum to NCIA's motion for summary judgment, I will address it.
"[A]n employee is entitled to relief under Title VII ... if an employer 'deliberately' makes the 'working conditions' of the employee 'intolerable' in an effort to induce the employee to quit." *Martin v. Cavalier Hotel Corp.*, 48 F.3d 1343, 1353–54 (4th Cir.1995) (citations omitted). "[I]n order to demonstrate constructive discharge, a plaintiff must allege and prove two elements: (1) 'deliberateness of the employer's actions' and (2) intolerability of the working conditions." *Id.* at 1354 (citations omitted). To establish that the employer's actions were deliberate, a plaintiff must also show that " 'the actions complained of

were intended by the employer as an effort to force the employee to quit.' " *Id.* (citations omitted).

Yancey has not produced sufficient direct or circumstantial evidence, even considering the inferences to which she is entitled at this stage, to show that NCIA's offered transfer to the Rosewood ALU was intended to force her to quit. NCIA offered Yancey the transfer, at her request, to the only full-time position available at the time. Yancey chose not to accept the position for the sole reasons, as she testified in her deposition, that she had been hurt at Rosewood and she did not want to work under Pointer's supervision because he had written her up for absenteeism. In an affidavit prepared after her deposition, Yancey states that she did not want to go to the Rosewood ALU for the additional reason that sex offenders would be under her supervision at Rosewood. I do not consider this reason in my analysis because it is submitted in an affidavit which contradicts her deposition testimony. *See Pitman*, 935 F.Supp. at 643 (citing *Barwick*, 736 F.2d at 959). Yancey's decision to refuse the transfer from the allegedly harassing environment, not NCIA's actions, led to Yancey's refusal to report to work and ultimately NCIA's discharge of her.

Furthermore, Yancey cannot establish the intolerability of working conditions under which she never worked. Although Yancey was employed at Rosewood for several days in 1994, it is not established in the record that she worked under Pointer's supervision at that time or that,

tion for Yancey, which the law does not require, it is difficult to imagine what more NCIA could have done to address Yancey's allegations once the responsible official learned of them, and to prevent harassment from occurring in the future.[11] Accordingly, I find that reasonable minds could not disagree that NCIA took prompt and adequate remedial action designed to end the harassment when informed of Yancey's allegations against Johnson, and liability cannot be imputed to NCIA for Johnson's alleged acts.

## IV. RELIGIOUS DISCRIMINATION [12]

In *Shapolia v. Los Alamos National Laboratory*, 992 F.2d 1033 (10th Cir.1993), the Tenth Circuit declined to apply to religious discrimination, based on failure to be a member of a religion, the prima facie requirements that normally govern sex and race discrimination discharge cases. *Id.* at 1038. Instead, it held that a plaintiff who maintains that he was discriminated against because he did not share his employer's religious beliefs must, in order to make out a prima facie case, show: (1) that he was subjected to some adverse employment action; (2) that, at the time the employment action was taken, the employee's job performance was satisfactory; and (3) some additional evidence to support the inference that the employment actions were taken because of a discriminatory motive based upon the employee's failure to hold or follow his or her employer's religious beliefs. *Id.* I find *Shapolia* to be well-reasoned and expressive of the federal stan-

dard applicable to Title VII religious discrimination claims of this type. *Accord Venters v. City of Delphi,* 123 F.3d 956, 972 (7th Cir.1997); *Henegar v. Sears, Roebuck and Co.,* 965 F.Supp. 833, 836 (N.D.W.Va.1997). *Cf. Chalmers v. Tulon Co. of Richmond,* 101 F.3d 1012 (4th Cir.1996), *cert. denied,* —— U.S. ——, 118 S.Ct. 58, 139 L.Ed.2d 21 (1997)(elements of religious accommodation claim under Title VII).

■ Yancey was subjected to adverse employment action in the form of the written warning on October 9, 1995, the five-day suspension on October 11, 1995, and the discharge on October 20, 1995. However, Yancey has not established that at the time these actions were taken, her job performance was satisfactory. It is undisputed that at the time of the warning on October 9, 1995, Yancey had missed 52 hours of work during the previous three months: 16 hours during the two-week pay period of July 21; eight hours during the period of August 18; 12 hours during the period of September 15; and eight hours during the period of September 29 in addition to the eight hours on October 8, 1995.[13] NCIA's sick leave policy indicates in relevant part that "[t]wo instances of sick time use during any three month period . . . will be monitored to determine if personnel action is warranted." The policy also states that "[a]buse of sick leave can result in disciplinary action up to and including termination." Yancey was in violation of NCIA's sick leave policy, subject to monitoring and disciplinary action at the time that

despite her unfortunate work-related injury, the conditions at Rosewood were intolerable in any regard. Yancey's apparent speculation that working conditions at Rosewood *could have been* intolerable will not support a claim of constructive discharge.

11. The court's ruling may have been different if Yancey had presented evidence that Johnson engaged in a pattern of sexually harassing behavior against other women over time, that other complaints had been lodged against Johnson in the past, that prior reprimands of Johnson did not result in a modification of his behavior, that Johnson's supervisors joked about Yancey's sexual harassment complaints after warning Johnson not to engage in sexual harassment, and that Yancey would still be exposed to Johnson in the

workplace despite NCIA's offered transfer. *See e.g., Paroline,* 879 F.2d at 106–107.

12. In her complaint, Yancey indicated that she believed that NCIA's conduct was discriminatory based upon her religion. However, she did not indicate that she was pursuing a cause of action for discriminatory failure to promote. Accordingly, I will treat her religious discrimination claim as one alleging disparate treatment and discriminatory discharge.

13. Yancey seems to persist in her belief that NCIA's failure to inform her of the exact dates of her absences matters. It does not. Disclosure of the exact dates of work missed is immaterial given that Yancey does not dispute the accuracy of the number of hours missed during the weeks designated on the document given to her by NCIA.

disciplinary action was taken against her on October 9, 1995. Thus, Yancey has not established that her job performance was satisfactory at the time of the adverse employment action on October 9, 1995.

Yancey's job performance only deteriorated more precipitously after October 9, 1995. Her unprofessional behavior at the meeting on October 11, 1995, led to her written warning being converted into a five-day suspension. Then, Yancey's refusal to accept a transfer and refusal to report for work led to her termination on October 20, 1995. Again, Yancey has not established that her job performance was satisfactory at the time of any of the adverse employment actions taken by NCIA and thus, has not established a prima facie case of religious discrimination.

## V. DISCRIMINATORY DISCHARGE

■ In order to establish a prima facie case of discriminatory discharge under Title VII, a plaintiff must establish by a preponderance of the evidence that: (1) the plaintiff is a member of a protected class; (2) the plaintiff was qualified for her job and her job performance was satisfactory; (3) that, despite her qualification and performance, she was fired; and, (4) that the position remained open to similarly qualified applicants after her dismissal. *Moore v. Reese*, 817 F.Supp. 1290, 1297 (D.Md.1993)(citing *Williams v. Cerberonics, Inc.*, 871 F.2d 452 (4th Cir. 1989); *Holmes v. Bevilacqua*, 794 F.2d 142, 146 (4th Cir.1986)(en banc)). If a prima facie case is established, the burden of production shifts to the defendant to articulate a legitimate non-discriminatory reason for the challenged employment decision. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973); *Moore*, 817 F.Supp. at 1295. If the defendant articulates legitimate non-discriminato-

ry reasons, the burden shifts to the plaintiff to show, by a preponderance of the evidence, that the employers proffered reason was a pretext for a discriminatory motivation. *Moore*, 817 F.Supp. at 1295 (citing *Tuck v. Henkel Corp.*, 973 F.2d 371 (4th Cir.1992), *cert. denied*, 507 U.S. 918, 113 S.Ct. 1276, 122 L.Ed.2d 671 (1993)); *Williams*, 871 F.2d at 455–56.

■ Yancey has not established a prima facie case of discriminatory discharge under Title VII. Although Yancey is a member of a protected class, she has not established that her job performance was satisfactory at the time of her termination. As discussed above, at the time of her termination, Yancey had recently been disciplined for excessive absenteeism, disciplined for unprofessional behavior and indicated that she would not report for work the next day. Furthermore, Yancey put forth no evidence showing that her position remained open to similarly qualified applicants after her dismissal. Accordingly, Yancey has not established a prima facie case of discriminatory discharge.

## VI. RETALIATORY DISCHARGE [14]

■ Title VII prohibits an employer from taking retaliatory action against an employee who opposes or complains about an unlawful employment practice or otherwise exercises rights under Title VII. 42 U.S.C. § 2000e–3(a). The employee's underlying discrimination claim does not have to be meritorious, *Ross v. Communications Satellite Corp.*, 759 F.2d 355, 357 n. 1 (4th Cir.1985), and it is not required that the employee have instituted formal proceedings under Title VII to invoke the protection of Title VII's retaliation provision; informal complaints to the employer will suffice. *See Armstrong v. Index Journal Co.*, 647 F.2d 441, 448 (4th Cir. 1981).

The well-known *McDonnell Douglas* scheme of proof applies in the evaluation for summary judgment purposes of Title VII

---

14. Yancey seems to allege that Johnson retaliated against her by "writing her up" after she refused his sexual advances. This is not an appropriate retaliation claim. At the time that Yancey was "written up" by Johnson, she had engaged in no protected activity for which Johnson could allegedly have been retaliating against her.

Yancey also seems to allege that NCIA retaliated against her by offering her a transfer to the Rosewood ALU. Again, Yancey is not stating an appropriate retaliation claim. Her claim that the offered transfer was inappropriate is addressed in the constructive discharge discussion at note 10.

retaliation claims; thus, to establish a prima facie case of unlawful retaliation, Yancey must project evidence sufficient to show by a preponderance of the evidence that: (1) she engaged in protected activity; (2) her employer took adverse employment action against her; and (3) a causal connection exists between the protected activity and the adverse action. *McNairn v. Sullivan,* 929 F.2d 974, 980 (4th Cir.1991); *Ross,* 759 F.2d at 365; *Bodoy v. North Arundel Hospital,* 945 F.Supp. 890, 898 (D.Md.1996), *aff'd,* 112 F.3d 508 (4th Cir.1997) (per curiam).

▪ If evidence sufficient to support a prima facie case is projected by plaintiff, then the employer must project evidence of the existence of a legitimate, non-discriminatory, non-retaliatory reason for the adverse action, and thereby rebut the presumption of retaliation raised by the plaintiff's prima facie case. *Ross,* 759 F.2d at 365. "Finally, if the employer produces a legitimate nondiscriminatory explanation, the employee bears the ultimate burden of proving retaliation by demonstrating that the employer's proffered reason is pretextual." *Id.* It is not sufficient for Yancey to show that her protected activity was "part" of the reason for the employer's adverse action. *Id.* at 365–66. *See Woodson v. Scott Paper Co.,* 109 F.3d 913, 933–35 (3d Cir.1997)("mixed motive" analysis not applicable to claim of unlawful retaliation, notwithstanding 1991 amendments to Title VII), *cert. denied,* ── U.S. ──, 118 S.Ct. 299, 139 L.Ed.2d 230 (1997); *Tanca v. Nordberg,* 98 F.3d 680, 682–83 (1st Cir.1996), *cert. denied.,* ── U.S. ──, 117 S.Ct. 1253, 137 L.Ed.2d 333 (1997)(same); *but see Beinlich v. Curry Development, Inc.,* 54 F.3d 772 (4th Cir.1995)(table), 1995 WL 311577, at *3 (May 22, 1995)(assuming "mixed motive" analysis applied to retaliation claim)(dicta). Rather, Yancey must show "that the adverse action would not have occurred 'but for' the protected conduct." *Ross,* 759 F.2d at 365–66.

▪ Yancey has established a prima facie case of retaliatory discharge under Title VII. She engaged in protected activity when she informed NCIA of her allegations of sexual harassment on October 11 and October 17, 1995. On October 20, 1995, at the very meeting held to address her concerns, just nine days after she initially informed NCIA of her allegations, Yancey was fired. I find that the close temporal proximity of the protected activity and the adverse employment action establishes the causal connection required for a prima facie case of retaliatory discharge.

▪ Consistent with the *McDonnell Douglas* scheme of proof in retaliatory discharge cases, NCIA has presented evidence of legitimate, non-retaliatory reasons for discharging Yancey. NCIA offered evidence that Yancey was discharged because she refused to accept a transfer to another ALU and indicated that she would not report to work the next day. I find that NCIA has presented a legitimate, non-retaliatory reason for Yancey's discharge.

Yancey has failed to meet her final burden under the *McDonnell Douglas* analysis; she has not established that NCIA's reason for discharging her was a pretext for a true retaliatory reason. Yancey has not presented any evidence beyond temporal proximity to support her claim of retaliatory discharge, and she has failed to show that she would not have been discharged "but for" her complaints of sexual harassment. Accordingly, I find that Yancey has not established that NCIA's proffered reason is a pretext for a true retaliatory one.

## VII. CONCLUSION

For the foregoing reasons, I shall grant NCIA's motion for summary judgment.